ALLEN MACHINERY CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62163.    Filed November 28, 1958.

*David P. Brown, Jr., Esq.*, and *David H. Rosenbluth, Esq.*, for the petitioner.

*George H. Bowers, Jr., Esq.*, for the respondent.

Withey, *Judge:* The respondent determined deficiencies in petitioner's personal holding company surtax for the years and in the amounts as follows:

| *Fiscal year ended January 31* | *Deficiency* |
| --- | --- |
| 1952 | $9,506.40 |
| 1953 | 12,117.61 |
| 1954 | 12,687.65 |

The issue presented for our decision is the correctness of the respondent's action in determining that at least 80 per cent of the petitioner's gross income for the taxable years ended January 31, 1952, January 31, 1953, and January 31, 1954, constitutes personal holding company income within the meaning of section 502 (e) of the Internal Revenue Code of 1939 so as to subject the petitioner to the imposition of a personal holding company surtax under section 500 of the 1939 Code.

## FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

The petitioner was organized under the laws of the State of New Jersey on February 5, 1951, and maintains offices both at Camden, New Jersey, and Chicago, Illinois. Its Federal income tax returns for the fiscal years ended January 31, 1952, January 31, 1953, and January 31, 1954, were filed with the director of internal revenue at Camden, New Jersey. The returns were prepared on a cash basis.

F. J. Allen, a mechanical engineer, who was a citizen and resident of the United Kingdom, owned 96 per cent of the capital stock of petitioner during the years in issue.

John T. Hepburn, Limited (hereinafter referred to as Hepburn), of Toronto, Ontario, Canada, during the years here in issue and for many years prior thereto, was a manufacturer of machine tools and of equipment and complete plants for the production of artillery and artillery shells. Hepburn, for many years prior to the years here in issue, frequently had obtained contracts for the sale of its products outside of the Dominion of Canada (primarily in Europe) through the representation and efforts of F. J. Allen and his associates acting through one or more of the several companies which he controlled or with which he was associated.

After a long period of negotiations, on November 2, 1950, Hepburn obtained a contract with the Government of Pakistan to supply equipment for a complete shell production plant. This contract was obtained for Hepburn through the joint efforts, in London, Washington, D. C., and Pakistan, of certain representatives of Hepburn and of the entire staff of Canadian Machine Tools, Limited, a company with which F. J. Allen was associated.

The contract was issued to Hepburn by the Embassy of Pakistan at Washington, D. C., and its satisfactory performance required that Hepburn be represented in the United States to the end that contact between it and the Pakistan Embassy concerning such matters as production schedules, delivery schedules, actual delivery, payments, and the possible procurement of new contracts for Hepburn with the Pakistan Government be maintained. Because of the satisfactory experience and long-established relationship which Hepburn had had with F. J. Allen and the companies with which he was associated, Hepburn was desirous of obtaining the services of such a company to assist it in maintaining the necessary contact with the Pakistan Embassy and generally servicing the contract executed on November 2, 1950. Upon Hepburn's request, Allen decided to organize a corporation in the United States for the purpose of providing Hepburn with the assistance it desired and furnishing such services as the satisfactory performance of its contract with the Pakistan Government might

require. Consequently, Allen arranged with an attorney in Camden, New Jersey, to have petitioner organized under the laws of the State of New Jersey. The incorporation of petitioner was completed on February 5, 1951.

An agreement with Hepburn to assist it in the performance of its contract with the Government of Pakistan was entered into with petitioner in the form of a letter addressed to it under date of February 7, 1951, which reads as follows:

*February 7, 1951.*

ALLEN MACHINERY CORPORATION,
*908–911 Broadway Stevens Bldg.,*
*Camden 3, N. J., U. S. A.*

GENTLEMEN:

In connection with the Contract No. 2559/D95 dated November 2, 1950, which we have secured from the Embassy of Pakistan, Washington, D. C., U. S. A., it is understood that you will keep in close contact with the Pakistan Embassy during the currency of this contract, attend to such matters as progress payments, inspection, technical collaboration, and shipments and further, that you will use your best endeavours to secure additional contracts from the Pakistan Government in connection with additional shell plant which we understand will shortly be under discussion.

We agree to pay, in Canadian funds, for your services 5% of the final invoice prices of all the machines, conversions and tools shipped by us on the above contract with the exception of:

1. Four Thread Mill Nose Machines
2. Two Drill and Tap Keep Screw Hole Machines
3. That portion representing the amount of the invoice price of:
    a. All electrical equipment
    b. All export boxing.

The invoice prices are F. O. B. our works Toronto, Canada, excluding all taxes.

On Items 1 and 2 we will pay you 5% of our suppliers' invoice price in Canadian funds. These prices are F. O. B. suppliers' works, excluding all taxes. On Item 3 no payment to you will be made.

The above payments are due you only on receipt by us of final payment from the Pakistan Government of our final invoices for the equipment completed by us and accepted by the Pakistan Government on the above contract.

We are enclosing our cheque No. 613 dated February 7, 1951, on the Dominion Bank Agency, New York, N. Y., in the amount of $7,000.00, United States funds, which is an advance on payment for the service as outlined above. We estimate that our total payment to you will amount to some $22,000.00 Canadian funds, which you must appreciate is only a very approximate estimate and does not commit our Company to this figure in any way.

    Yours very truly,

JOHN T. HEPBURN, LIMITED
*President*

WAH/AW
*Encl.*

The foregoing letter agreement was accompanied by a check issued by Hepburn and drawn to petitioner's order in the amount of $7,000, representing advance commissions.

In accordance with the agreement Hepburn paid petitioners for its services thereunder $15,500 during the fiscal year ended January 31, 1952, and $16,883.53 during the fiscal year ended January 31, 1953.

At the end of each of the following fiscal years the employees of petitioner were:

|  | January 31— | | |
|  | 1952 | 1953 | 1954 |
| President and general manager. | F. J. Allen | F. J. Allen | F. J. Allen. |
| Office manager | Gilbert C. Gilbert. | --------------- | |
| Assistant general manager. | --------------- | Gilbert C. Gilbert. | Gilbert C. Gilbert. |
| Secretary and treasurer | Robert J. Tait Paul. | Robert J. Tait Paul. | Robert J. Tait Paul. |
| Chief technical assistant | --------------- | Glen C. Martin | Glen C. Martin. |
| Engineer in charge of installation. | --------------- | Dwight P. Tilling. | Dwight P. Tilling. |
| Other office employees | Eunice Flynn, Martha Dermond. | Eunice Flynn, Martha Dermond. | Eunice Flynn. Martha Dermond. |

Apart from the performance of services required by Hepburn under the agreement of February 7, 1951, petitioner's activities from January 31, 1952, through January 31, 1954, consisted primarily of designing engineering and consulting services and a sales agency concerned exclusively with machinery and equipment for use in the production of artillery and projectiles. Petitioner's engineering services were rendered to customers and prospective customers and its sales were principally of custom-built machinery and machine tools, particularly those manufactured by Hepburn. With respect to the sales by petitioner of Hepburn products, petitioner's selling and engineering services were conducted pursuant to a written contract between Hepburn and F. J. Allen executed on July 1, 1951. This contract was executed for the purpose of obtaining sales engineering and installation engineering services in connection with the sale and promotion of Hepburn products in the United States and provided, in part, as follows:

WHEREAS the Agent [F. J. Allen] is desirous of acquiring the exclusive selling rights in the territory hereinafter designated for certain Single Purpose Machine Tools and Equipment and replacement parts and tools therefor manufactured by the Company [Hepburn];

\* \* \* \* \* \* \*

1. The company hereby grants to the Agent the exclusive selling rights in the following designated territory, namely, the Continental United States of America \* \* \*. There shall be excluded from the operation of this agreement all Single Purpose Machine Tools and Equipment and replacement parts and tools therefor to be delivered outside the Continental United States of America

notwithstanding that the contract for the supply thereof may be negotiated by or on behalf of the Company in the United States of America.

2. The Agent agrees that he will submit, and will cause each sub-agent appointed by him to submit, all tenders for agency products acting as a representative of the Company. The Agent further agrees that the Agent shall not, and shall not permit any sub-agent appointed by him to, commit the Company to the acceptance of any contract, verbal or otherwise, or any agreement, verbal or otherwise, without the authorization of the Company in writing and that the Agent will not, and will not permit any sub-agent appointed by him to, collect any moneys on behalf of the Company unless with its written consent.

      \*         \*         \*         \*         \*         \*         \*

4. The Agent agrees to provide, at his expense, suitable office or offices and staff commensurate with the business possibilities of the agency products in the United States of America in order to maintain contact with customers and potential customers and to provide the necessary labour to implement the warranty \* \* \* (set forth in other articles of the contract).

      \*         \*         \*         \*         \*         \*         \*

7. It is agreed that the Agent shall provide fully competent and qualified service engineers to perform such services as may from time to time be required by the ultimate purchasers. The salary, living expenses and other expenses of such engineers shall be borne by the Agent.

8. The Agent agrees to use his best efforts to introduce and sell agency products manufactured by the Company throughout the said designated territory and the Company agrees to forward forthwith to the Agent full particulars of all enquiries, orders, quotations and relevant correspondence received from persons within the said designated territory. The Agent agrees to forward forthwith to the Company full particulars of all enquiries, orders, quotations and relevant correspondence received by the Agent or any sub-agent appointed by him from persons outside the said designated territory. The agent agrees to forward forthwith to the Company copies of all tenders and quotations made, orders received and all relevant correspondence received by the Agent or any sub-agent appointed by him from persons within the said designated territory. The Agent agrees that the Company has the right to refuse or reject any offer submitted to it by or through the Agent or any sub-agent appointed by him and that no commission shall be payable in respect of any offer so refused or rejected.

      \*         \*         \*         \*         \*         \*         \*

10. The Agent shall have the right to appoint sub-agents throughout the said designated territory provided that no such sub-agent shall be appointed without the approval of the Company in writing which approval may be arbitrarily withheld.

11. The Agent shall not sell any agency products outside the said designated territory or knowingly sell any agency products to any person for shipment outside the said designated territory. The Agent shall not permit any sub-agent appointed by him to sell any such agency products outside the said designated territory or to knowingly sell any such agency products to any person for shipment outside the said designated territory.

      \*         \*         \*         \*         \*         \*         \*

13. The Agent shall have the right to assign the benefit of this agreement to Allen Machinery Corporation or, subject to the approval of the Company, to any corporation controlled by the Agent. This agreement shall, however, be subject to cancellation by the Company if any corporation to which the benefit of this

agreement is so assigned ceases at any time to be controlled by the 'Agent or if the Agent is not rendering technical advice to such corporation on a substantial basis; in either of such events the Company may at any time thereafter give notice in writing to the Agent of its cancellation of this agreement and upon the giving of such notice this agreement shall be cancelled.

The foregoing contract was assigned by Allen to petitioner on July 31, 1951, and it operated thereunder during each of the years in issue. At the time the contract was executed with Allen on July 1, 1951, Hepburn knew that Allen's commitments with the many foreign companies with which he was associated would permit him to devote only a small portion of his own time to the affairs of petitioner. During the period of petitioner's operations under this contract, Hepburn dealt with all of the employees of petitioner in connection with matters relating to engineering and sales of Hepburn products. During the years here in issue Allen spent only approximately 3 months of each year on the North American Continent. During such periods Allen visited many places in the United States, the West Indies, and frequently the Hepburn office at Toronto, Canada. Allen's services to petitioner during each of those years were directed solely to the supervision, direction, and coordination of the operations of its staff. During the years in issue the bulk of the sales and engineering services provided by petitioner with respect to Hepburn products pursuant to the contract executed July 1, 1951, were actually performed by petitioner's staff of salesmen and engineers.

Petitioner received payments from Hepburn under the contract executed July 1, 1951, for the years and in the amounts as follows:

| Fiscal year ended January 31 | Amount |
|---|---|
| 1952 | $60, 000. 00 |
| 1953 | 81, 834. 45 |
| 1954 | 118, 000. 00 |

The foregoing amounts are exclusive of the amounts paid to petitioner under the agreement of February 7, 1951. In addition to the amounts received by petitioner from Hepburn under that agreement and the contract executed July 1, 1951, the petitioner received the following items of gross income during the years in issue:

| | Jan. 31, 1953 | Jan. 31, 1954 |
|---|---|---|
| British Industries Corp | $4, 052. 31 | $2, 862. 07 |
| Yeates Machinery and Supply Co | 527. 26 | 337. 75 |
| Fees for Engineering Services: | | |
| Cleveland Welding Co | 96. 70 | _____ |
| Rudisell Foundry Co | 567. 02 | _____ |
| U. S. Hoffman Machinery Co | 250. 26 | _____ |
| Reliance Elevator Co | _____ | 21. 19 |
| Ball Machinery Corp | _____ | 2, 420. 87 |
| Interest | 8. 75 | . 24 |
| | $5, 512. 05 | $5, 642. 12 |

The agreement of February 7, 1951, did not designate Allen as the individual to perform selling, engineering, and other services in connection with Hepburn products and did not give to Hepburn any right to call upon Allen to render such services. The contract executed on July 1, 1951, and assigned to petitioner on July 31, 1951, required Allen personally to advise, coordinate, and supervise the selling and engineering staff of petitioner.

OPINION.

The question here presented is whether during the taxable years ended January 31, 1952, January 31, 1953, and January 31, 1954, the petitioner was a personal holding company within the meaning of section 501 (a) of the Internal Revenue Code of 1939.[1]

Since F. J. Allen owned 96 per cent of petitioner's outstanding stock during the years here in issue, the stock ownership requirement set forth in section 501 (a) (2) of the 1939 Code was met and, if at least 80 per cent of its gross income for the years in question constituted personal holding company income, as defined in section 502 of the Code, the petitioner was a personal holding company.

The respondent has determined that more than 80 per cent of petitioner's gross income in each of the years in issue was personal holding company income within the meaning of section 502 (e) (1) of the 1939 Code[2] as having been received under personal service contracts.

Pursuant to the provisions of section 502 (e) of the Code, personal holding company income consists of amounts received pursuant to contracts under which the corporation is to furnish personal services, provided 25 per cent or more of the outstanding stock of the corporation is owned by the individual who may be or is designated as the

[1] SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

[2] SEC. 502. PERSONAL HOLDING COMPANY INCOME.

For the purposes of this subchapter the term "personal holding company income" means the portion of the gross income which consists of:

\* \* \* \* \* \* \*

(e) PERSONAL SERVICE CONTRACTS.—(1) Amounts received under a contract under which the corporation is to furnish personal services; if some person other than the corporation has the right to designate (by name or by description) the individual who is to perform the services, or if the individual who is to perform the services is designated (by name or by description) in the contract; \* \* \*

one to perform such services. Since more than 80 per cent of the petitioner's gross income in each of the years in issue was received under two service contracts and since one individual, F. J. Allen, owned 96 per cent of petitioner's stock in each of those years, the issue involved herein is narrowed to the question whether F. J. Allen was designated in either or both of the contracts in question as the one to perform the required services, or whether Hepburn acquired the right to designate him to perform those services.

With respect to the letter agreement between Hepburn and petitioner dated February 7, 1951, Hepburn had obtained a shell plant contract with the Government of Pakistan on November 2, 1950. Although the negotiations for the Pakistan contract were conducted in London and Pakistan, the contract was ultimately issued to Hepburn by the Pakistan Embassy in Washington, D. C. As a result of the contract with Pakistan, it became necessary for Hepburn, a Canadian Company with no United States office, to maintain contact with the Pakistan Embassy at Washington, D. C., in order to expedite the performance of the contract and to attend to such matters as production standards, deliveries, and payment.

For many years Hepburn had dealt satisfactorily in Great Britain and other countries through British companies controlled by F. J. Allen. Consequently, Hepburn requested the establishment of an Allen-controlled United States corporation to assist it in maintaining contact with the Pakistan Embassy in Washington, D. C., and in promoting possible future sales of its products to Pakistan. Allen accordingly employed an attorney in Camden, New Jersey, to organize petitioner under the laws of the State of New Jersey for the purpose of acquiring a servicing contract (represented by the letter agreement of February 7, 1951) from Hepburn.

Although the agreement between Hepburn and the petitioner does not mention F. J. Allen, nevertheless, since he owned 96 per cent of petitioner's stock, the respondent contends that the "you" referred to in that agreement did not mean petitioner, but meant Allen personally. However, the appropriate grammatical expression (other than "you") which Hepburn normally would be expected to use in addressing petitioner is not apparent, and the respondent does not suggest a more appropriate pronoun Hepburn might utilize to designate explicitly the corporate addressee. Further, had Hepburn desired to obtain personal services from Allen under this agreement, it could have issued the agreement directly to him personally, and provided against its assignment by him, rather than issuing it in the name of petitioner.

It is clear to us, after carefully reviewing this letter agreement, that the terms of the agreement cannot be construed as requiring the per-

sonal services of any individual, inasmuch as no person is named or otherwise designated therein, and the only party to the contract who possessed the right to designate or appoint any individual to render personal services thereunder was the petitioner itself.[3]

Our decision in *General Management Corporation*, 46 B. T. A. 738, affd. 135 F. 2d 882, certiorari denied 320 U. S. 757, is in point here. There, the taxpayer was engaged in financial rehabilitation work for other corporations. More than 50 per cent of the capital stock of the taxpayer was owned by its Comptroller, Gillam, who was an expert specializing in corporate finance. The taxpayer entered into a contract with the Magill-Weinsheimer Co. in which the taxpayer agreed that it would make a study of the operation, management, and sales problems of Magill-Weinsheimer Co. and in accordance therewith to submit recommendations for reducing operating costs, increasing profits, and improving its financial condition. Magill-Weinsheimer Co. agreed to follow any such recommendations and to pay the taxpayer $500 per month for its services, in addition to a percentage of its earnings. No individual was named or in any way designated in the contract to provide such services and the taxpayer alone had the right to designate the individual who was to undertake the services required. We there held that the contract in question did not constitute a personal service contract within the meaning of section 403 (e) of the Revenue Act of 1938, a provision substantially identical to section 502 (e) of the 1939 Code.

A review of the facts involved in the instant case in the light of our decision in *General Management Corporation*, *supra*, and the example illustrating the application of section 502 (e) of the 1939 Code found in the respondent's regulations heretofore cited, leads us to the opinion that no individual was designated in the letter agreement executed between petitioner and Hepburn on February 7, 1951, and that Hepburn did not acquire the right to designate any individual to perform the services required thereunder. We accordingly hold that this agreement did not constitute a personal service contract within the meaning of section 502 (e) of the 1939 Code.

---

[3] Regulations 118:

Sec. 39.502–1 *Personal holding company income.* The term "personal holding company income" means the portion of the gross income which consists of the following:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(h) *Amounts received under personal service contracts.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) The application of section 502 (e) may be illustrated by the following examples:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*Example (2).* The N Corporation, the entire outstanding capital stock of which is owned by four individuals, is engaged in engineering. The N Corporation entered into a contract with the O Corporation to perform engineering services for the O Corporation, in consideration of which the O Corporation was to pay the N Corporation $50,000. The individual who was to perform the services was not designated (by name or by description) in the contract and no one but the N Corporation had the right to designate (by name or by description) such individual. The $50,000 received by the N Corporation from the O Corporation does not constitute personal holding company income.

The contract executed between Hepburn and Allen on July 1, 1951, and subsequently assigned to petitioner on July 31, 1951, was executed for the purpose of obtaining sales engineering and installation engineering services in connection with the sale and promotion of Hepburn products in the United States. The respondent based his determination that this contract constitutes a personal service contract within the meaning of section 502 (e) of the 1939 Code primarily on two provisions in the contract which indicate that Hepburn was looking to Allen, personally, as the one to control and supervise the particular activities called for by the agreement. These two contractual provisions are (1) an agreement by Allen that he will "use his best efforts to introduce and sell agency products manufactured by the Company throughout the said designated territory [the continental United States]," and (2) the provision that the agreement shall be "subject to cancellation by the Company if any corporation to which the benefit of this agreement is so assigned ceases at any time to be controlled by the Agent or if the Agent is not rendering technical advice to such corporation on a substantial basis."

Although F. J. Allen only visited the United States for a period of 3 months during each of the years in issue and despite the fact that the bulk of the work performed pursuant to the contract was actually performed by petitioner's staff of salesmen and engineers rather than by Allen, it is nevertheless apparent that Hepburn looked to Allen personally to provide the managerial and supervisory services which were required for the satisfactory conduct of petitioner's employees. It is clear from the record herein that Allen alone possessed the authority to control the policies and activities of petitioner. Allen's actual participation consisted primarily of the supervision and coordination of sales and engineering service.

Hepburn's reliance upon F. J. Allen obviously was founded upon the successful business relationship existing between them which had extended over a period of many years and as a result of which Allen had promoted and sold Hepburn products in Europe. By contractually requiring that Allen either control petitioner or that he provide the petitioner with technical advice on a substantial basis, Hepburn was assured that Allen would assume personal responsibility with respect to the promotion and sale of its products in the United States. Consequently, the contract was made expressly contingent upon either the corporate control or the technical advice of F. J. Allen.

Again we are of the opinion that our decision in *General Management Corporation, supra,* is in point. In addition to the Magill-Weinsheimer contract heretofore discussed, a second contract was there involved. As previously mentioned, the majority of the capital stock of the taxpayer was owned by Gillam, an individual who was

an expert specializing in corporate management and finance. For many years Gillam personally had served the United Printers & Publishers, Inc., in financial and administrative matters. Such services were rendered at the request of several banking creditors of United. In 1937, after the retirement by United of its outstanding bank loans, the taxpayer corporation contracted with it to render services similar to those which had been furnished by the taxpayer's officer and stockholder, Gillam. The contract provided that the taxpayer "continue to supply to the Company the services of Grant Gillam," and that in the event that Gillam should die and the taxpayer is thereafter unable to supply an individual satisfactory to United, it had the right to terminate the contract.

Despite the fact that most of the services furnished by the taxpayer were performed by individuals other than Gillam, we there found that the services of Gillam were of primary importance so far as United was concerned and we accordingly held that the contract between the taxpayer and United was a personal service contract under section 403 (e) of the Revenue Act of 1938.

In our view, the factual situation presented in *General Management Corporation, supra,* with respect to the United contract, is sufficiently similar to the facts here involved to render our decision in that case controlling of the issue before us. In view of the foregoing, we hold that the contract executed July 1, 1951, constituted a personal service contract within the meaning of section 502 (e) of the 1939 Code.

Inasmuch as the amounts received by petitioner during the taxable years ended January 31, 1952, and January 31, 1953, under the contract executed July 1, 1951, do not equal 80 per cent of its gross income, the petitioner was a personal holding company only for the year ended January 31, 1954, section 501 (a) (1) of the Internal Revenue Code of 1939.

*Decision will be entered under Rule 50.*