S. O. CLAGGETT, LIQUIDATING TRUSTEE FOR S. O. CLAGGETT, INC., A CORPORATION (DISSOLVED), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2471–63. Filed June 30, 1965.

*Allen A. Bowden*, for the petitioner.
*Norman H. McNeil*, for the respondent.

---

Scott, *Judge:* Respondent determined deficiencies in the income tax of S. O. Claggett, Inc., for the calendar years 1958, 1959, and 1960 in the respective amounts of $5,894.78, $15,449.32, and $7,663.66.

The issue for decision is whether during the taxable years 1958 through 1961 petitioner's income was derived from a personal service contract and therefore constituted personal holding company income within the provisions of section 543(a)(7)[1] of the Internal Revenue Code of 1954.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

S. O. Claggett, Inc., hereinafter referred to as petitioner, was incorporated under the laws of the State of Washington on April 24, 1958. Its address was 120 North Ralph Street, Spokane, Wash. It filed its Federal corporation income tax returns for the years 1958, 1959, 1960, and 1961 with the district director of internal revenue at Tacoma, Wash.

During the years here involved, Sam O. Claggett (hereinafter referred to as Sam) owned all of petitioner's capital stock, was petitioner's president and its only salaried officer. Petitioner's other officers were Max Kuney, Jr., and W. B. Peterson, both of Spokane, Wash., vice president and secretary-treasurer, respectively. Sam has been engaged in the construction business since 1931. He is a general building construction superintendent. He started in the construction business in 1931 and over the years his occupation has been the construction of buildings and bridges. Sam has the necessary experience and skill to prepare bids (estimates of costs), to locate good supervisory foremen, superintendents, carpenters, cement finishers, and iron workers, to negotiate with unions, to deal with architects, and to negotiate subcontracts. Sam's knowledge of construction includes a general comprehension of construction planning, and he has over the years acquired a following or an organization of very able field men, which he leads, as a general superintendent. Sam's business training, experience, and ability lie in the management area of building construction.

Max J. Kuney Co. is a business name used by a related partnership and corporation whose business address is North 120 Ralph Street, Spokane, Wash. The Kuney partnership owned construction equipment which it leased to the Kuney corporation which was the operating side of the business. The primary business activity of the Kuney partnership and corporation was heavy and highway construction.

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated. At the time the notice of deficiency in this case was issued sec. 543(a)(5) contained the provisions now contained in sec. 543(a)(7). The Revenue Act of 1964 redesignated sec. 543(a)(5) of the Internal Revenue Code of 1954 to be sec. 543(a)(7). Herein we will refer to the section as redesignated, 543(a)(7).

Since the dual form of organization has no bearing on the instant case, the Kuney partnership and the corporation will be referred to hereinafter as Kuney Co.

Sam initially became associated with the Kuney Co. in 1946 as an employee. A joint venture under the name of Kuney-Johnson Co.— Lease and Leighland employed Sam as a project manager to build Navy housing at Astoria, Oreg. He was paid a salary of $200 per week plus 12 percent of the profits. Thereafter, Sam was employed by Kuney-Johnson Co. as a general building superintendent. Kuney-Johnson Co. was a partnership between Max J. Kuney Co. and L. W. Johnson and was primarily engaged in building construction. Kuney-Johnson Co. was one of a series of joint venture or partnership arrangements between Max J. Kuney Co. and other individuals. Combining resources and capital in this manner is customary in the construction business. Beginning in 1953 Sam and Kuney Co. changed their relationship in order to provide a better job and a more attractive income for Sam. The arrangement was in accordance with an oral agreement for the year 1953 and the greater part of 1954.

The minutes of the meeting of directors of Max J. Kuney Co. on May 13, 1953, state in part as follows:

It was then pointed out that prior to the above transaction the MAX J. KUNEY COMPANY, partnership, had financed the operations of Kuney Johnson Company, a partnership, Agutter Electric Company, a partnership, Architectural Aluminum Company, a corporation, and Kuney Claggett, a partnership. The question was then presented as to the advisability of this corporation continuing this policy with respect to the financing of said businesses. After much discussion and consideration it was decided that it would be profitable to continue the financing of the respective businesses above mentioned whereupon, upon motion duly made and seconded, the following resolution was unanimously adopted:

RESOLVED, that the President or Vice-President of this corporation is hereby authorized to loan corporate funds to Kuney Johnson Company, a partnership, Agutter Electric Company, a partnership, Kuney Claggett, a partnership, and Architectural Aluminum Company, a corporation, in such amounts and upon such terms as in the judgment of said President or Vice-President shall be to the best interests of this corporation.

On September 2, 1954, Sam and the Kuney Co. entered into a written agreement entitled "Partnership Agreement." This agreement provided as follows:

PARTNERSHIP AGREEMENT

This agreement formalizes the partnership agreement in ~~operations~~ effect since January 1, 1953 between the Max J. Kuney Company general partnership and S. O. Claggett, an individual, and/or Max J. Kuney Company, Inc., and S.O. Claggett, an individual.

In the following wherever the word KUNEY appears it shall be understood to be either Max J. Kuney Company general partnership or Max J. Kuney Com-

pany, Inc., as the case may be, and where the word CLAGGETT appears it shall be understood to be S. O. Claggett, an individual. The words KUNEY-CLAG-GETT shall be understood to denote the partnership between Max J. Kuney Company general partnership and S. O. Claggett and/or the partnership between Max J. Kuney Company, Inc., and S. O. Claggett, as the case may be.

It is the intention of the parties that specific contracts undertaken, generally of a building construction nature, shall be operated on a partnership basis. These contracts, whether undertaken in the name of KUNEY, or some other trade name to be selected in the future embodying identification of S. O. Claggett in said trade name, shall be the only contracts to which this special partnership agreement shall apply. These specific contracts shall be selected by agreement between the parties hereto and shall be identified on the books of account of KUNEY by the notation KUNEY-CLAGGETT OPERATION.

KUNEY shall provide such funds and credit as are available and agreed necessary to finance KUNEY-CLAGGETT operations, shall provide office space, local telephone, general office facilities and accounting service at its executive office. KUNEY shall provide open yarding, warehousing and shop space at its executive headquarters to the extent available without interefence with other operations of KUNEY.

For the services provided by KUNEY in the paragraph immediately above KUNEY-CLAGGETT operations interest and bank charges, at the current rate borrowed funds and banking services are available to KUNEY, on KUNEY'S net cash investment in KUNEY-CLAGGETT operations. The net investment shall be calculated on an average monthly basis, shall include the cost price of any equipment purchased by KUNEY for the account of KUNEY-CLAGGETT and shall be adjusted by the amount of the balance in the personal and capital accounts of CLAGGETT on the books of KUNEY. KUNEY will charge KUNEY-CLAGGETT operations $200.00 per month for miscellaneous office services and general facilities provided in the paragraph immediately above and in addition will charge at actual cost long distance telephone charges, telegraph charges and all other items of general expense paid by KUNEY and properly allocable to KUNEY-CLAGGETT operations.

KUNEY will purchase for the account of KUNEY-CLAGGETT such capital equipment items as the partners may agree shall be advantageous to purchase. For accounting purposes these items shall be held by KUNEY and co-mingled with other capital equipment items owned separately by KUNEY; however, the purchase price of the equipment, and depreciation on these items as written off for Federal Income Tax purposes shall be charged by KUNEY, annually or at more frequent intervals, to KUNEY-CLAGGETT. All such capital equipment shall be separately identified on the books of KUNEY by the initials "KC" following the purchase identification number in KUNEY'S ledger purchase account. Gains or losses on the sale or other disposition of equipment shall be credited or charged by KUNEY to KUNEY-CLAGGETT operations.

In addition to the above KUNEY may provide personal managerial and consulting services of its partners and/or corporate officers, as the case may be, for the benefit of KUNEY-CLAGGETT operations, but shall not be under obligation to do so, KUNEY shall have equal partnership authority with CLAGGETT and in addition necessarily shall have final authority on matters relating to individual projects to be undertaken by KUNEY-CLAGGETT and the amount of financing to be provided.

CLAGGETT shall devote his full time and efforts to the management and furtherance of KUNEY-CLAGGETT operations exclusively and shall be fully responsible for all phases of administration and operation of KUNEY-CLAGGETT operations except for services agreed to be provided by KUNEY above.

All expenses of KUNEY-CLAGGETT operations shall be paid by KUNEY in conformity with his established accounting system and all receipts from KUNEY-CLAGGETT operations shall come direct to KUNEY for deposit in his regular bank account after proper identification on the books of KUNEY in conformity with his established accounting system.

Profits or losses from KUNEY-CLAGGETT operations, after special charges provided above, determined in conformity with this agreement and KUNEY'S established accounting method and as finally accepted for Federal Income Tax purposes, shall be divided equally between KUNEY and CLAGGETT by allocation to the capital accounts of each partner on the books of KUNEY.

Withdrawals from the capital accounts of each partner in normal amounts to cover normal expenses are authorized. Abnormal withdrawals jeopardizing the working capital of KUNEY-CLAGGETT or any partner's reserve for his share of possible losses shall be subject to the approval of all partners.

This agreement shall remain in force until dissolved by the death of a partner or withdrawal of a partner. Upon death, profits or losses shall be determined to the date of a partner's death and settlement with his estate shall be made on the basis of the book value of his interest at the date of death, adjusted by the book value of his interest in any capital equipment held by KUNEY for the account of KUNEY-CLAGGETT at the date of the deceased partner's death. Payment to a partner's estate shall be made in monthly payments, or oftener at the survivor's option, with the first payment due not later than three months after the partner's death and final payment due not later than fifteen months after the partner's death. In the event of withdrawal of a partner settlement shall be made between the partners, as agreed by all the partners, in the manner most beneficial to all under the circumstances existing at the time of the partnership termination.

Signed and sealed at Spokane this 2nd day of September, 1954.

No partnership information returns (Form 1065) were ever filed with respondent by or on behalf of Sam and the Kuney Co. with respect to Kuney-Claggett operations. Sam, however, did report partnership income from Kuney Co. on his individual returns for the years 1953 through 1957.

After the execution of the agreement of September 2, 1954, Sam continued to perform duties as a general building construction superintendent but instead of performing such duties for the Kuney-Johnson partnership under an employment agreement, his duties were performed in accordance with the terms of the agreement entered into on September 2, 1954. Sam on his personal Federal income tax returns reported net taxable income (adjusted gross income less personal deductions plus dependency credits of $4,200 each year) of $12,499.90 in 1953, $20,963.89 in 1954, zero in 1955, $23,895.29 in 1956, and $98,479.81 in 1957. In 1958 Sam incorporated S. O. Claggett Co., Inc., the petitioner herein. A primary consideration leading to Sam's decision to form S. O. Claggett, Inc., was that by drawing a salary from the corporation he would be able to maintain a steady level of yearly income, leaving earnings from years of high income in the corporation with which to pay his salary in years of lower income, with a resultant tax saving by the lower corporate tax rate as compared to his personal tax rate in years of high earnings. Additional considerations leading

to Sam's decision to form the corporation were the limited liability afforded to a business involving substantial risks and having available his own corporation for investment of his earnings and for the retention of future corporate earnings for the possible conduct of business separately from the Kuney Co.

The minutes of the annual meeting of the directors of Kuney Co. on May 1, 1958, state as follows:

The next matter brought before the meeting was the incorporation of S. O. Claggett, an individual, into S. O. Claggett, Inc. and approval was sought for substitution of S. O. Claggett, Inc. in partnership with the company in place of S. O. Claggett, an individual. Following discussion in detail and thereupon, on motion duly made, seconded and unanimously carried, the following resolution was adopted: Resolved that effective January 1, 1958 the partnership of S. O. Claggett, an individual, with this company be hereby terminated and effective the same day a new partnership consisting of S. O. Claggett, Inc., be formed with this company with all terms and conditions of the previous partnership to be effective in the new partnership.

Sam in his capacity as president of S. O. Claggett, Inc., and as an individual, together with the Kuney Co. partnership and corporation and Max J. Kuney, president, and Max J. Kuney, individually, executed a guaranty to the Seattle-First National Bank to guarantee liabilities and indebtedness which Max J. Kuney Co. had incurred or might incur with that bank. Liability insurance effective January 1, 1958, was obtained from the United Pacific Insurance Co. providing protection for bodily-injury liability, property-damage liability, and medical payments for the following insured: "Max J. Kuney, Max J. Kuney, Jr., W. R. Petersen, W. R. Wiginton, DBA Max Kuney Company, Max J. Kuney, Inc., and S. O. Claggett and Max J. Kuney Co., DBA Kuney-Claggett Co." Effective as of January 1, 1959, the names of the insured were completed to read as follows: "(1) MAX J. KUNEY, (2) MAX J. KUNEY, JR., (3) S. O. CLAGGETT, INC. (4) W. B. PETERSEN (5) W. R. WIGINTON (6) MAX J. KUNEY, MAX J. KUNEY, JR., W. B. PETERSEN AND W. R. WIGINTON, DBA MAX KUNEY COMPANY, (7) MAX J. KUNEY, INC., AND (8) S. O. CLAGGETT AND MAX J. KUNEY COMPANY, DBA KUNEY-CLAGGETT COMPANY."

This insurance was in effect from January 1, 1958, through December 31, 1964.

All of the accounting or bookkeeping of S. O. Claggett, Inc., was performed by Max J. Kuney Co. Kuney Co. charged the Kuney-Claggett operations with interest on operating capital provided by Kuney Co., with depreciation on equipment purchased by Kuney Co. for the account of Kuney-Claggett, as well as other costs or expenses, in order to arrive at the net profit from Kuney-Claggett operations.

Consistent with this system of accounting petitioner's returns show no operating assets or expenses. The manner in which the accounting and bookkeeping operations were carried on was customary to the Kuney Co. method of doing business. It had been used by the Kuney Co. for many partnerships and joint ventures since 1940. The employees hired for the Kuney-Claggett, Inc., operation were paid with bank drafts drawn on a bank account in the name of the Kuney Co. Petitioner's tax returns showed for the taxable years 1958 through 1962 Sam as its sole employee. The employees of the Kuney-Claggett operation numbering nearly 200, at certain times, were paid by Kuney Co. and their wages or salaries charged to the joint operation. In conformity with the agreement of September 2, 1954, Sam received his 50-percent share of net profits and was responsible for any losses incurred. After 1958 petitioner received a 50-percent share of the profits and assumed responsibility for 50 percent of the losses.

Sam, as president of S. O. Claggett, Inc., received a salary in each of the years in issue and the remainder of any profits accruing to the corporation was retained as earned surplus in the corporation and invested as capital in the Kuney-Claggett operation. Sam, as president and majority shareholder of petitioner from 1958 to 1962 conducted the business of petitioner in the same manner as he had conducted his individual business under his agreement with Kuney Co. providing for the Kuney-Claggett operation. Sam prepared estimates and bids on construction jobs. He hired, supervised, and fired as many as 200 employees who were working for the Kuney-Claggett operation and in general conducted the Kuney-Claggett, Inc., operations.

Petitioner throughout its existence paid no dividends on its capital stock.

A resolution of dissolution of petitioner was adopted by its sole shareholder on December 19, 1962, and the resolution for voluntary dissolution of petitioner was filed with the secretary of state of the State of Washington on May 3, 1963, subsequent to the issuance of the notice of deficiency herein on March 14, 1963, and a trustee certificate of final dissolution was filed with the secretary of state of the State of Washington on June 19, 1963.

In his statutory notice of deficiency, respondent determined that petitioner's entire income for each of the years 1958 to 1961 was derived from a personal service contract performed by its sole stockholder within the provisions of section 543(a)(7), and accordingly, determined that petitioner was a personal holding company as defined in section 542(a) liable for the personal holding company surtax for each of the years 1958 through 1960.

The income reported by petitioner from Kuney Co. during the taxable years here involved did not constitute amounts received under a personal service contract within the meaning of section 543 (a) (7). Petitioner, accordingly, was not a personal holding company during that period.

OPINION

The controversy in this case is whether petitioner's income for each of the years 1958 through 1960 constituted amounts received under a contract under which it was to furnish personal services with the individual to perform the services being designated in the contract. If its income did consist of such amounts this income constituted personal holding income under section 543 (a) (7).[2] Sam owned all of petitioner's outstanding stock during the years here in issue and since petitioner does not come within any of the exceptions specified in section 542,[3] it is a personal holding company if its income is personal holding company income.

All of petitioner's gross income in each of the years here involved was derived from its joint operations with Kuney Co. Petitioner argues that this income was its distributive portion of the income of a partnership and was not "amounts received under a contract under which the corporation is to furnish personal services." Respondent takes the position that the arrangement between Kuney Co. and petitioner was not a partnership but rather was one of employment of an independent contractor. In support of this contention respondent states that the employment arrangement existing between Kuney Co.

---

[2] SEC. 543(a)(7). PERSONAL SERVICE CONTRACTS.—

(A) Amounts received under a contract under which the corporation is to furnish personal services; if some person other than the corporation has the right to designate (by name or by description) the individual who is to perform the services, or if the individual who is to perform the services is designated (by name or by description) in the contract; and

(B) amounts received from the sale or other disposition of such a contract.

This paragraph shall apply with respect to amounts received for services under a particular contract only if at some time during the taxable year 25 percent or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for the individual who has performed, is to perform, or may be designated (by name or by description) as the one to perform, such services.

[3] SEC. 542. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if—

(1) GROSS INCOME REQUIREMENT.—At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * *

and Sam prior to 1953 was merely continued on a different basis of compensation after 1953 and even after the execution of the document entitled "Partnership Agreement" on September 2, 1954, except that under the agreement of September 2, 1954, Sam was more in the nature of an independent contractor. The facts do not support respondent's position. The facts here show that Kuney Co. and Sam operated as joint venturers or partners from sometime in 1953 until the incorporation of petitioner. The agreement of September 2, 1954, has all the normal provisions of a partnership agreement. It provided for the sharing of profits and losses, joint control of the business even though Kuney Co. could exercise final authority on projects to be undertaken, the leaving of profits in the operation as capital investment by the partners, and the rendering of services to the operation by each partner. It also provided that either party could withdraw from the partnership. The other evidence of record likewise supports the existence of a partnership. The testimony is that Kuney Co. and Sam intended to form a partnership and their method of operation confirms the existence of such an intent. The legal relationship between Kuney Co. and Sam from sometime in 1953 until the formation of petitioner was one of partnership. *Beck Chemical Equipment Corporation*, 27 T.C. 840, 849 (1957).

Respondent does not contend that if a partnership existed between Sam and Kuney Co., petitioner did not replace Sam as the partner.[4] Respondent contends that if the relationship between Sam and Kuney Co. is viewed as one of partnership, the provision that Sam would perform certain services for the partnership remained in effect when petitioner became the partner of Kuney Co. and Sam's contract in this regard with Kuney Co. was in some way assigned to petitioner. Respondent states that the following provision of the agreement of September 2, 1954, constitutes a contract between Kuney Co. and Sam which Sam assigned to petitioner:

CLAGGETT shall devote his full time and efforts to the management and furtherance of KUNEY-CLAGGETT operations exclusively and shall be fully responsible for all phases of administration and operation of KUNEY-CLAGGETT operations except for services agreed to be provided by KUNEY above.

This is the "contract" from which respondent contends amounts were received by petitioner which constituted personal holding company income under section 543(a)(7).

---

[4] Respondents does not contend that a corporation cannot be a partner and under the law of the State of Washington which has adopted the Uniform Partnership Act, a corporation is competent to become a member of a partnership. Wash. Rev. Code, secs. 25.04.020 and 25.04.060 (1955).

We need not decide whether petitioner is correct in its contention that under no circumstances could a partnership agreement be the type of contract referred to in section 543(a) (7) and that a corporation's distributive partnership income could not be considered "amounts received under a contract under which the corporation is to furnish personal services," since we agree with petitioner that the facts in the instant case support its position that its partnership agreement with Kuney Co. did not give the right to some person other than petitioner to designate the individual who is to perform services for the Kuney-Claggett, Inc., operation and did not itself designate such a person.

The partnership agreement of September 2, 1954, was between Sam and Kuney Co. That partnership was terminated when petitioner was organized and a new partnership formed between Kuney Co. and petitioner as reflected in the minutes of the Max J. Kuney Co. Petitioner was substituted for Sam in his individual capacity. This substitution as agreed to by both parties effectively terminated all of Sam's individual rights and duties under the agreement of September 2, 1954. In *Mervyn Inv. Co.* v. *Biber*, 184 Cal. 639, 194 Pac. 1037 (1921), the following is stated with respect to an assignment to a corporation by one partner of his partnership interest with the consent of the other partner: "That under such conditions an assignee of one partner steps into the partnership shoes of his assignor is well recognized by the courts."

In *Wilson* v. *Wilson*, 216 P. 2d 104 (Cal. Dist. Ct. App., 2d Dist. 1950), a substitution agreement of a son for his father in a partnership which provided for a new partnership agreement to be entered into was upheld even though such new agreement had not been executed with the following statement:

The signing of such a new agreement was logical when the parties bound by it changed, even if otherwise no changes in the terms were intended. The substitution agreement of February 15, 1938, does not show any intention to change the partnership terms except for the reservation made with respect to a salary and/or monthly drawing account of plaintiff. To uphold its validity, the agreement must be construed as calling otherwise for terms identical with those of the old partnership agreement insofar as the parties would not voluntarily agree to changes. There is no extrinsic evidence whatever in the record that points to another intent. So understood the provision with respect to the making of a new partnership agreement does not destroy the certainty of the substitution agreement.

Unless this view is taken, there existed no agreement between Kuney Co. and petitioner for any services to Kuney-Claggett, Inc., to be rendered by anyone. Sam would remain the partner of Kuney Co. with his interest in the profits assigned. The agreement would be between Sam and Kuney Co. and the income only would be assigned

by Sam to petitioner. See Wash. Rev. Code, sec. 25.04.270.[5] In fact much of respondent's argument is directed more to a contention that petitioner was a sham with no business purpose for its existence than to the issue here present.

On the basis of all the facts here present, we find that there existed no contract between Kuney Co. or the Kuney-Claggett, Inc., partnership and petitioner specifying by name or description that Sam would be the person to perform the services to the Kuney-Claggett, Inc., operation even though we recognize that all persons involved probably expected that Sam would render the services to the Kuney-Claggett, Inc., operation which petitioner was called upon to render under its partnership agreement.

For amounts to constitute personal holding company income under section 543(a)(7) they must be paid under a contract designating the person to render the services. *General Management Corporation*, 46 B.T.A. 738 (1942), affd. 135 F. 2d. 882 (C.A. 7, 1943), certiorari denied 320 U.S. 757; *Allen Machinery Corporation*, 31 T.C. 441 (1958); *Able Metal Products, Inc.*, 32 T.C. 1149 (1959); and *Kurt Frings Agency, Inc.*, 42 T.C. 472 (1964), on appeal (C.A. 9, Sept. 3, 1964).

Since petitioner had no personal holding company income in any of the years here involved it is not a personal holding company under section 542 and is not subject to personal holding company tax.

*Decision will be entered for petitioner.*

---

[5] This section provides as follows:

25.04.270  Assignment of partner's interest.  (1) A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignees, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled.