## GENERAL MANAGEMENT CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8115.

Circuit Court of Appeals, Seventh Circuit.

May 24, 1943.

Rehearing Denied July 6, 1943.

Carl Meyer, Benjamin A. Ragir, Harry Thom, and Alfred M. Rogers, all of Chicago (Mayer, Meyer, Austrian & Platt, of Chicago, of counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., J. P. Wenchel and Chas. E. Lowery, Bureau of Internal Revenue, both of Washington, D. C., and Muriel S. Paul, Sewall Key, and Carlton Fox, Sp. Assts. to the Atty. Gen., for respondent.

Before KERNER, MINTON, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Petitioner questions a decision of the Tax Court declaring it a personal holding company in the taxable year 1938, for the reason that more than 80 per cent of its gross income for that year constituted "personal service corporate income" within the meaning of Section 402 of the Revenue Act of 1938, 26 U.S.C.A. Int.Rev. Code, § 501. The propriety of the decision depends wholly upon whether a contract with United Printers and Publishers, Inc., hereafter referred to as United, from which it derived $24,000, was a "personal service contract" which "designated" the person who was to perform the services, within the meaning of Section 403(e) of the Act. 26 U.S.C.A. Int. Rev.Code, § 502(e).

Petitioner is a corporation which has, for a number of years, been engaged actively in rehabilitating financially embarrassed business concerns. Grant Gillam owned 100 of its total capital issue of 200 shares; his sister, S. Margaret Gillam, 80 and Marguerite Miller, 20. From 1932 to 1938 petitioner served United, first, at the request of a creditor bankers' committee and, finally, under a contract made in February, 1937, after the bank loans had been retired, wherein it was provided, amongst other matters, that petitioner should render certain services, including specifically those of Gillam, for $2,000 per month. The agreement designated Gillam as comptroller, provided that he should "continue to supervise the physical operations of United, its divisions and subsidiaries" and gave to him full authority over the expenditure and borrowing of money. It provided further that, if he should die or become incapacitated and no one could be obtained to take his place satisfactory to United, the latter might terminate the contract. In addition to the services to be performed by Gillam, petitioner agreed also to furnish budgets, audits, cost accounts and various reports. In pursuance of this employment, petitioner received in 1938, $24,000 as compensation.

Under Section 403, personal service income includes amounts received under contracts under which the corporation is to furnish personal service, provided 25 per cent or more in value of the outstanding stock of the corporation is owned by an individual designated as the one to perform such service. Inasmuch as Gillam owned 50 per cent of the corporate stock, the question narrows to whether he is "designated by the contract as the one to perform such service."

Gillam, as the principal stockholder of petitioner, had for some years been a doc-

tor of financially embarrassed corporations and other business set-ups. He had had wide experience in solutions of problems of management, production, finance and rejuvenation of sick industrial enterprises. Beginning with 1932, as the active agent of petitioner, he had rendered curative administrative service to United, visiting and surveying its plants, its operating divisions and its production, directing its activities, its fiscal and financial policies, acting not only as "comptroller" but also as supervisory administrative head and exercising and making available his discretionary executive talents. Successful results ensuing from his service culminated in 1937 in retirement of United's bank loans, ridding it of supervision by the representatives of bank creditors, whose pressure had brought petitioner into the picture as financial director.

The bank loans having been satisfied, United voluntarily contracted with petitioner to continue to render similar service. This agreement specifically provided for discharge of supervisory functions by Gillam, saying that he should "continue" as comptroller and supervise the physical and financial operations of United, its various divisions and subsidiaries. No money was to be borrowed or paid except as approved by him. Thus he continued as the administrative, financial, fiscal and supervisory head of United. His was the voice of discretionary control. In case of his death, United was to have the option of rescission of the contract. Obviously, the evidence supported the finding that United's desire to avail itself of his constructive discretionary and advisory capacities was the inspiring motive leading to execution of the contract.

In addition to Gillam's designated services under the contract, petitioner, through employees other than Gillam, made projected budgets of United's cash needs, audited its accounts, prepared its income tax returns and made up statements of costs, balance sheets and similar reports. In actual preparation of none of these did Gillam participate. In consequence, petitioner insists, as he was not designated to perform all services rendered United, the income received from United is not within the statute. But the labor supplied by persons other than Gillam consisted, obviously, of preparation of the mechanical tools necessary to efficient discharge of his functions as administrative and controlling head. Such budgets, statements, and reports are some of the implements by which an executive or administrative agent works his way to a definite determination of corporate policy. In their preparation, discretion is not involved but, rather, physical compilation and few if any directors of policies are capable of exercising a wise discretion without their employment. They are the trowel of the mason, the plane of the carpenter, the nurse assisting the physician. The contract designated Gillam as the only agency endowed with discretion, and was made optionally contingent upon his continued ability to act. Under it, anyone included in the personnel of petitioner or found outside might supply the working tools. Their source was a factor of no importance. Clearly the court was justified in finding from this evidence that discretionary service designated to be performed by Gillam was the inspiring motive for his designation and that the makers of the tools utilized supplied only incidental aid necessary to achievement of the desired purpose,—administrative supervision by Gillam.

The value of labor supplied in preparing reports, audits and accounts may be an element proper to be considered in determining the question but where, as here, the evidence amply justifies the ultimate conclusion of fact that such additional service amounted to mere supply of the implements needed in performance of the administrative duties of Gillam, we think that the tax court properly refused to give determinative weight to that factor.

Petitioner insists that the contract was not the type of agreement intended by Section 403. But we think the statute speaks clearly and covers the kind of service contract here involved.

Inasmuch as it results from inclusion of $24,000 as a part of the personal service income that more than 80 per cent of the gross income of petitioner is personal service income, the decision is affirmed.

MINTON, Circuit Judge (dissenting).

When Congress passed the legislation in question, it was attempting to prevent the evasion of income and other taxes by the use of the personal holding company. By this device, an artist, business executive, movie star or other person whose income from his exceptional talents was great, would form a corporation and contract his

services to such corporation at a nominal sum. The corporation would then in turn contract with the real employer for the large income such employer was willing to pay for the exceptional talents of the designated party, and the talented person would thereby escape taxes. The talented person was always named in the contract with the real employer. The statute under consideration had for its purpose to tax heavily the income from a contract of this kind which called for the services of a designated person.

In the case at bar, the petitioner corporation was no such device for tax evasion. It was a corporation organized to conduct a legitimate business. True, the services of Mr. Gillam were its most valuable asset, and the contract did exact his services by name. No doubt the parties especially desired his services. But his services were not the only services the petitioner rendered. In the contract that produced the considerations the Government would tax, the petitioner contracted for and rendered budgetary, accounting and income tax services that Gillam was wholly incapable of performing, and some of which, such as the making of income and other tax reports, could not have been of the slightest assistance to Gillam in the performance of his services. Indeed, of the services rendered by the petitioner to earn the $24,000 income involved in this case, $16,000 was for services rendered by petitioner's staff other than Gillam. I cannot agree that these services were incidental, and on a par with those of a craftsman's helper who "fetched and carried" tools and materials for the craftsman to perform his job. These large and valuable services, which Gillam did not and could not perform, were not rendered just in apprenticeship or as assistance to Gillam in the performance of his duties. The services were independent services rendered by the petitioner. Gilliam did not render all of the services paid for. He did not render over a third of the total services performed by the petitioner.

The case at bar is that of a corporation engaged in rendering a legitimate business service with no purpose to use the corporation to evade taxes. If Gillam's name had not been mentioned in the contract, there would have been no basis for the Government's claim. Because his name was mentioned in the contract, the Government takes in taxes and penalties

92% of the income of the corporation. I had always understood that tax statutes dealt with realities—the substance of things and not the form. The only reality in this case is that the taxpayer has to pay a large penalizing tax because the Government pursued the phantom of a form. Legitimate business should not be subjected to such penalizing statutes under a strained construction. Tax statutes are to be strictly construed in favor of the taxpayer where the Government is trying to bring the taxpayer within the provisions of the statute. Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211.

I think the decision of the Tax Court should be reversed.