KURT FRINGS AGENCY, INC., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 95304.   Filed June 2, 1964.

*Aaron S. Rosenthal* and *Jack J. Rosenthal,* for the petitioner.
*Paul G. Wilson, Jr.,* for the respondent.

FAY, *Judge:* The Commissioner determined deficiencies in peti-
tioner's income tax as follows:

| Fiscal year ended Jan. 31— | Deficiency |
|---|---|
| 1957 | $19, 584. 68 |
| 1958 | 19, 611. 14 |
| 1959 | 28, 637. 54 |
| 1960 | 25, 120. 38 |

The only issue for decision[1] is whether or not the petitioner was sub-
ject to the personal holding company tax imposed by section 541[2] for
any or all of the years involved herein.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts,
together with the exhibits attached thereto, is incorporated herein by
this reference.

Petitioner, Kurt Frings Agency, Inc., is a California corporation
organized on February 1, 1956.   Petitioner maintained its books on
a cash basis, using a fiscal year ending January 31.   It filed Federal
corporation income tax returns for the fiscal years here involved with
the district director of internal revenue at Los Angeles, Calif.

Petitioner's issued and outstanding stock was owned by Kurt Frings
(hereinafter sometimes referred to as Kurt), the latter acquiring the
stock on March 27, 1956, for the sum of $1,000.   Kurt owned the
entire outstanding stock of petitioner during the years here involved.

---

[1] Petitioner has conceded the only other adjustment made by respondent.
[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of
1954, as amended.

Kurt was president of petitioner during the years in issue and as such devoted all of his time to the business of petitioner.

The nature of petitioner's business was to represent actors, directors, writers, producers, and others involved in the field of entertainment as the artists' manager. (Hereinafter when the term "artists" is used it will include actors, directors, writers, producers, and others involved in the field of entertainment.) An artists' manager is a person (including a corporation) who offers to or does represent, acts as the personal manager or representative of, negotiates for, procures employment for, and counsels or advises members of the Screen Actors Guild in and about and in connection with or relating to their employment as artists in the production of motion pictures (including motion pictures made for television). The word "agent" is synonymous with artists' manager. The services rendered by petitioner consisted of advising artists on scripts, negotiating for their contracts, and talking to producers, directors, and writers about a particular actor with the aim of arranging an interview which might eventually lead to a contract. These services rendered by petitioner to its clients were of a personal nature. During the years involved herein, petitioner was licensed by the California Labor Commission as an artists' manager. Petitioner, during this period, held a franchise issued by the Screen Actors Guild, a California corporation, authorizing petitioner to act as an artists' manager for artists who were Guild members. Petitioner was also a member of the Artists' Managers Guild.

Kurt has been an artists' manager since 1941. At first he was employed by an agency. In 1945 or 1946 he went into business for himself and operated as a sole proprietor. At the time of petitioner's incorporation, Kurt was representing various actors in the entertainment field as an artists' manager. After incorporation, the petitioner continued to represent the same artists Kurt had been representing as an individual.

Petitioner represented the following number of artists during the years here involved:

| Fiscal year ended Jan. 31— | Number of artists |
|---|---|
| 1957 | 34 |
| 1958 | 65 |
| 1959 | 74 |
| 1960 | 91 |

In each case petitioner would enter into a contract with the artist, using one of the following three contracts: (1) Theatrical motion picture agency contract (artists' manager contract), (2) television motion picture agency contract (artists' manager contract), or (3)

standard AFTRA (American Federation of Television and Radio Artists) exclusive agency contract under rule 12–B. The choice of contract depended upon whether the artist involved was in the field of making motion pictures (television or otherwise) or in the field of television.

The theatrical motion picture agency contract and the television motion picture agency contract were almost identical in their terms and provisions. Paragraph 8 of both contracts provides as follows:

The Agent agrees that the following person only shall personally supervise the Actor's business during the term of this contract. * * * The person above named shall be available at all reasonable times for consultation with the Actor at the city named in Paragraph (9) or its environs during reasonable business hours, subject to absence of the person from the office occasioned by his agency activities outside of the office at the studios and elsewhere, and subject further to reasonable absences due to illness or reasonable vacation periods. The Agent upon request of the Actor and on reasonable notice shall assign such person to conduct negotiations for the Actor at such city or its environs and such person shall do so; it being understood that subagents employed by the Agent who are not named herein may handle agency matters for the Actor or may aid the above named person in handling agency matters for the Actor. In the event the person above named shall cease to be active in the affairs of the Agent by reason of death, disability, retirement or any other reason, the Actor shall have the right to terminate this contract upon written notice to the Agent. The rights of the parties in such case are governed by Section XII of the Regulations.

In all cases where either of these two contracts was used, the name of "Kurt Frings" was inserted in paragraph 8. No other name was ever inserted either alone or in conjunction with the name of "Kurt Frings."

The terms of the standard AFTRA exclusive agency contract, though different, were not materially different from the terms of the other two contracts used by petitioner. The pertinent paragraphs of this contract are as follows:

8. The Agent agrees that the following persons, and the following persons only, namely * * * shall personally supervise the Artist's business during the term of this contract. One of such persons shall be available at all reasonable times for consultation with the Artist at the city or cities named herein. The Agent, upon request of the Artist, shall assign any one of such persons who may be available (and at least one of them always shall be available upon reasonable notice from the Artist), to engage in efforts or handle any negotiations for the Artist at such city or its environs and such person shall do so. Employees of the Agent who have signed the AFTRA covenant and who are not named herein may handle agency matters for the Artist or may aid any of the named persons in handling agency matters for the Artist.

9. In order to provide continuity of management, the name or names of not more than four (4) persons connected with the Agent must be written in the following space, and this contract is not valid unless this is done: * * * In the event three (3) or four (4) persons are so named, at least two (2) of such persons must remain active in the Agency throughout the term of this contract. In the event only one (1) or two (2) persons are so named, at least one (1) such person must remain active in the Agency throughout the term of this contract. If the required number of persons does not remain active with the Agency

the Artist may terminate this contract in accordance with Section XXIII of AFTRA's Regulations Governing Agents.

In all cases where this contract was used, the name of "Kurt Frings" was inserted in both paragraphs 8 and 9. No other name was ever inserted either alone or in conjunction with the name of "Kurt Frings."

None of the aforementioned contracts required the performance of services by an employee of petitioner other than Kurt.

Petitioner's commission for the services rendered pursuant to the contracts would be based upon a percentage, not to exceed 10 percent, of the moneys earned by the artist, directly or indirectly, under contracts of employment entered into during the term of the agency contract.

Petitioner received the following commissions during each of the years in issue:

| Fiscal year ended Jan. 31— | Commissions |
|---|---|
| 1957 | $51, 784. 20 |
| 1958 | 169, 439. 35 |
| 1959 | 237, 831. 38 |
| 1960 | 279, 814. 06 |

The above amounts represent petitioner's gross income in each of the years here involved.

Petitioner's earned surplus as of January 31, 1960, was $121,470.50. The cash balance as of the same date was $112,212.28. Petitioner, from its inception and throughout the years in issue, has not declared or paid a dividend.

During the years involved herein petitioner had employed a limited number of subagents. A subagent is a person employed by a franchised agent and who is authorized by the Screen Actors Guild to perform all the duties of an agent. The subagents employed by petitioner did represent and negotiate contracts for some of the artists under contract.

The following table shows the number of subagents employed by petitioner by years and the total salary paid the subagents:

| Fiscal year ended Jan. 31— | Number of subagents [1] | Total salary |
|---|---|---|
| 1957 | 3 | $1, 280. 00 |
| 1958 | 3 | 17, 735. 00 |
| 1959 | 3 | 27, 025. 00 |
| 1960 | 7 | 29, 837. 44 |

[1] Although the records of petitioner indicate that it employed 4 subagents in 1959 and 8 subagents in 1960, only 3 subagents in 1959 and only 7 subagents in 1960 were certified by the Screen Actors Guild. Since it is necessary to be certified by the Screen Actors Guild to act in the capacity of a subagent, we have found that petitioner had only 3 subagents in 1959 and only 7 subagents in 1960.

The three subagents employed by petitioner for the fiscal year ended January 31, 1957, were employees for less than 1 month. At-

least one of those subagents never before had been employed as an artists' manager. Of the seven subagents employed by petitioner for its fiscal year ended January 31, 1960, four were employed for less than 4 months.

Petitioner paid its president a salary of $2,000, $26,500, $26,000, and $55,400 for the fiscal years ended January 31, 1957, through January 31, 1960, respectively.

The net income of petitioner, computed without the benefit of deductions for compensation of officers and salary and wages for each of the years here involved, was as follows:

| Fiscal year ended Jan. 31— | Net income (without deductions for compensation of officers and salary and wages) |
|---|---|
| 1957 | $43,629.53 |
| 1958 | 101,686.32 |
| 1959 | 139,649.48 |
| 1960 | 190,747.58 |

A comparison of the salary paid to the subagents with the gross profits of the petitioner and with the net income of petitioner, without the benefit of the deductions for compensation paid to officers and salary and wages for each of the years here involved, reveals the following percentages:

| Fiscal year ended Jan. 31— | Subagents' salary— percentage of | |
|---|---|---|
| | Gross profit | Net income computed without benefit of deduction for compensation, etc. |
| | Percent | Percent |
| 1957 | 2½ | 3 |
| 1958 | 10½ | 17 |
| 1959 | 11½ | 19½ |
| 1960 | 10½ | 15½ |

The services performed by the subagents of petitioner were incidental to and in aid of the services performed by Kurt.

### OPINION

The only issue for decision is whether or not petitioner during the fiscal years ended January 31, 1957, through January 31, 1960, was a personal holding company within the meaning of section 542.[3]

---

[3] SEC. 542. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if—

(1) GROSS INCOME REQUIREMENT.—At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * *

Whether or not petitioner qualifies as a personal holding company is not dependent upon finding a tax-avoidance motive. *American Package Corporation* v. *Commissioner*, 125 F. 2d 413 (C.A. 4, 1942), affirming 44 B.T.A. 179 (1941). If petitioner meets the literal definition of a personal holding company, then the provisions of section 541 apply. Statutes of this nature, that is statutes attempting to remedy and correct a serious evil, in this situation the evil being the "incorporated talent," must be strictly construed. *Cedarburg Canning Co.* v. *Commissioner*, 149 F. 2d 526 (C.A. 7, 1945), affirming a Memorandum Opinion of this Court. See S. Rept. No. 1242, 75th Cong., 1st Sess., pp. 7-8, 1937-2 C.B. 609, 613.

The petitioner does not question the fact that the stock ownership test of section 542(a)(2) has been met in this case. Kurt has been the only stockholder of petitioner from the date of incorporation through and including the years in issue. Accordingly, there can be no question that the stock ownership test has been met. Cf. *Sebago Lumber Co.*, 26 T.C. 1070 (1956). Nor does petitioner argue that it qualifies under one of the exceptions to the definition of a personal holding company.[4] Therefore, petitioner is a personal holding company unless it can show that more than 20 percent of its gross income is not "personal holding company income" as that term is defined in section 543.

Both petitioner and respondent rely upon the definition of personal holding company income contained in section 543(a)(5)[5] to support their respective positions. This subsection is further amplified by section 1.543-1(b)(8), Income Tax Regs.[6] Petitioner contends that since

---

[4] See sec. 542(c).

[5] SEC. 543. PERSONAL HOLDING COMPANY INCOME.

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company income" means the portion of the gross income which consists of:

\* \* \* \* \* \* \*

(5) PERSONAL SERVICE CONTRACTS.—

(A) amounts received under a contract under which the corporation is to furnish personal services; if some person other than the corporation has the right to designate (by name or by description) the individual who is to perform the services, or if the individual who is to perform the services is designated (by name or by description) in the contract; and

(B) amounts received from the sale or other disposition of such a contract.

This paragraph shall apply with respect to amounts received for services under a particular contract only if at some time during the taxable year 25 percent or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for the individual who has performed, is to perform, or may be designated (by name or by description) as the one to perform, such services.

[6] Sec. 1.543-1(b) *Definitions*—

(8) *Personal service contracts.* (i) Under section 543(a)(5) amounts received under a contract under which the corporation is to furnish personal services, as well as amounts received from the sale or other disposition of such contract, shall be included as personal holding company income if—

(a) Some person other than the corporation has the right to designate (by name or by description) the individual who is to perform the services, or if the individual who is to perform the services is designated (by name or by description) in the contract; and

(b) At any time during the taxable year 25 percent or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for the individual who has

the services performed by its subagents are "important and essential," an allocation must be made to determine what portion of its gross income was derived from the personal services of Kurt. Petitioner goes on to state that once an allocation is made less than 80 percent of its gross income was derived from the personal services of Kurt and, therefore, it does not meet the qualifications of a personal holding company. Respondent, on the other hand, argues that the services of the subagents were not required by the terms of the contracts and, accordingly, no allocation should be made. Furthermore, respondent takes the position that the services performed by the subagents were not "important and essential" as that term is used in the regulation.

We are of the opinion that the amount received by petitioner for the rendering of services to its clients in the capacity of an artists' manager constitutes personal holding company income.

All of petitioner's income throughout the years in issue was derived from services performed as agent for various actors, writers, producers, and directors in the field of entertainment. The services included the reading of scripts, the arranging of contracts of employment, the meeting of producers and directors, and other services of a highly personal nature. There is no question but that the services performed by petitioner under its contracts were personal services as that term is used in section 543 (a) (5) (A).

Section 543 (a) (5) provides that amounts received under contracts to furnish personal services represent personal holding company income where the individual who is to perform the services is designated by name in the contract. However, for this provision to apply, the person designated in the contract must own 25 percent or more of the value of the outstanding stock of the corporation. Kurt owned 100 percent of the outstanding stock of petitioner, and he alone was the person designated to "personally supervise the Actor's business." Although the contracts provided that "subagents employed by the Agent [petitioner] who are not named herein may handle agency matters for the Actor," the record in this case convinces us that the person for whose services the artists were paying was Kurt. Cf.

performed, is to perform, or may be designated (by name or by description) as the one to perform, such services. For this purpose, the value of the outstanding stock shall be determined in accordance with the rules set forth in § 1.542-3. It should be noted that the stock ownership requirement of section 543 (a) (5) and this subparagraph relates to the stock ownership at any time during the taxable year. For rules relating to the determination of stock ownership, see section 544 and §§ 1.544-1 through 1.544-7.

(ii) If the contract, in addition to requiring the performance of services by a 25-percent stockholder who is designated or who could be designated (as specified in section 543 (a) (5) and subdivision (i) of this subparagraph), requires the performance of services by other persons which are important and essential, then only that portion of the amount received under such contract which is attributable to the personal services of the 25-percent stockholder shall constitute personal holding company income. Incidental personal services of other persons employed by the corporation to facilitate the performance of the services by the 25-percent stockholder, however, shall not constitute important or essential services.

*General Management Corporation,* 46 B.T.A. 738 (1942), affd. 135 F. 2d 882 (C.A. 7, 1943). Even though petitioner had numerous clients during the years involved, from a low of 34 to a high of 91, the only name ever inserted in the contract was "Kurt Frings." He had been in this business for 15 years prior to petitioner's incorporation. Part of that time he had been employed by another agency and part of the time he operated his own agency as a sole proprietor. He was well known in the field. Each contract allowed the artists to terminate the contract if Kurt no longer was associated with the petitioner by reason of death, disability, retirement, or any other reason.

We hold that the contracts in question were personal service contracts within the meaning of section 543(a)(5) and that the amounts accrued thereunder in each of the fiscal years involved herein constitute personal holding company income.

Petitioner's entire case is predicated upon the application of section 1.543(b)–1(b)(8)(ii), Income Tax Regs. It is argued that since the contracts provide for services to be performed by subagents and since the services actually performed by the subagents were essential and important, an allocation must be made to determine the income attributed to the services performed by Kurt. If an allocation is made, petitioner argues, it will be evident that more than 20 percent of the petitioner's gross income will be attributed to the services of the subagents, indicating that petitioner is not within the definition of a personal holding company.

A careful reading of the cited regulation, together with the terms of the contracts, plus an analysis of the facts, will show that petitioner's position cannot be sustained for two reasons, either one of which is fatal to its case.

The pertinent part of the regulation relied upon by petitioner provides that if

the contract, in addition to requiring the performance of services by a 25-percent stockholder who is designated * * * requires the performance of services by other persons which are important and essential * * *

an allocation must be made and only the income derived from the services of the 25-percent stockholder shall constitute personal holding company income. The language of the contracts relied upon by petitioner is as follows:

it being understood that subagents employed by the Agent who are not named herein may handle agency matters for the Actor or may aid the above named person in handling agency matters for the Actor.

We find the controlling word in the regulation is "requires" and that the word must be given its ordinary and common meaning. Cf. *Helvering* v. *Southwest Consol. Corp.,* 315 U.S. 194 (1942), and *Turnbow* v. *Commissioner,* 368 U.S. 337 (1961). Nowhere in the contracts are

the services of anyone other than Kurt required. The contract provision relied upon by petitioner indicates that the services of subagents "may" be utilized. They are not required by the contract. No artists testified at the trial of this case. Accordingly, the evidence of record is insufficient to indicate that any of the artists knew or even contemplated that services of a subagent would be used. To interpret "requires" to mean "may require" would be contrary to the regulation. In accordance with the policy of strict interpretation of statutes of this nature, *Cedarburg Canning Co.* v. *Commissioner, supra*, we give a strict interpretation to the regulation, which we hold to be consonant with the statute.

Furthermore, we have found as a fact that the services performed by the subagents were merely incidental to and in aid of the services performed by Kurt. Petitioner points to the fact that one man could not possibly have performed all the services for all of petitioner's clients. We agree with petitioner that Kurt did not perform all of the services for all of the clients of petitioner. However, the performance of all the services by Kurt is not required by the statute or the regulation. In *General Management Corporation, supra*, where a large portion of the services furnished by the taxpayer was not furnished by the individual designated in the contract, we nevertheless held that

The wide disparity between Gillam's [person designated in contract] and the others' salaries, the fact that Gillam's services as comptroller are specifically designated in the * * * contract, and the provisions of the * * * contract allowing termination of the contract by United [other party to contract] in the event of Gillam's death and the failure of petitioner to find another individual satisfactory to United, are clearly indicative that United entered into the contract so that it might receive Gillam's services. * * *

In *Allen Machinery Corporation*, 31 T.C. 441 (1958), we held that one of the two contracts involved therein was a personal service contract although the person designated in the contract to perform the services

only visited the United States for a period of 3 months during each of the years in issue and despite the fact that the bulk of the work performed pursuant to the contract was actually performed by petitioner's staff of salesmen and engineers rather than by Allen [person designated in contract] * * *

For petitioner to gain any comfort from the regulation he must show that the services performed by the subagents (assuming they were required) were essential and important. We feel the record does not sustain petitioner's contentions.

Petitioner at the end of its first fiscal year, January 31, 1957, had employed three subagents. One of the three had never been employed as a subagent before. All three subagents, according to the payroll records and testimony of petitioner's bookkeeper, were employed for about 1 month during this year. They were paid a total of $1,280, as

compared with gross income of $51,784.20 and net income, without the deduction for compensation for officers and salary and wages, of $43,629.53. On this record we are not pursuaded that the services rendered by petitioner's subagents for the fiscal year ended January 31, 1957, were essential and important. *General Management Corporation, supra.*

With regard to the remaining 3 fiscal years before us, the evidence indicates that the services performed by the subagents were considered by petitioner and by the artists to be incidental and of a routine nature. During the years ended January 31, 1958, and January 31, 1959, petitioner had employed only three subagents. Although petitioner employed seven subagents for the year ended January 31, 1960, four of them were employed for less than 4 months.

As set forth in our Findings of Fact, the combined salaries of the subagents never exceeded 11½ percent of the gross income of petitioner and never exceed 19½ percent of the net income of petitioner, without taking into consideration the deductions for compensation of officers and salaries and wages. At the same time petitioner paid Kurt a salary ranging from $26,500 for the fiscal year ended January 31, 1958, to $55,400 for the fiscal year ended January 31, 1960. Petitioner asserts that one of its subagents was paid a substantial salary and argues that he performed essential and important services and was responsible for bringing in additional clients. This particular subagent left the employ of petitioner during the calendar year 1960. Petitioner did not introduce any evidence regarding the effect the termination of this agent's employment had on petitioner. There is no showing whether petitioner lost any clients or whether petitioner's gross income sharply declined because of the loss of this subagent. However, it is clear that Kurt was the one person the artists looked to for consultation; he was the only person whose retirement from petitioner would allow a termination of the contract; and he was the one person designated and required to supervise and be responsible for the artists' business. This, plus the fact that Kurt brought with him 15 years of experience and a reputation, which the growth of petitioner's business indicates must have been excellent, leads us to the conclusion that the artists who entered into contracts with petitioner did so in order to obtain the services of Kurt. *Allen Machinery Corporation, supra;* and *Able Metal Products, Inc.*, 32 T.C. 1149 (1959). The know-how, connections, reputation, and goodwill of Kurt were the important services which the artists wanted to obtain. Any other services rendered under the contracts were merely incidental to the services performed by Kurt.

Accordingly, we hold that petitioner was a personal holding company for all the years here involved.

*Decision will be entered for the respondent.*